UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LINSFORD GILL, | ) | |
| | ) | |
| Petitioner, | ) | 15 C 8038 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| DAVID MITCHELL, Warden, Pinckneyville | ) | |
| Correctional Center, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Linsford Gill, an Illinois prisoner, petitions for a writ of habeas corpus under 28 U.S.C. § 2254. Docs. 1, 49. This court stayed this case at Gill's request pending his exhaustion of additional claims in state court, Docs. 11, 47, and then lifted the stay at his request, Doc. 50. Gill's habeas petition is denied and a certificate of appealability will not issue.

### Background

A federal habeas court presumes that state court factual findings are correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Jean-Paul v. Douma*, 809 F.3d 354, 360 (7th Cir. 2015) ("A state court's factual finding is unreasonable only if it ignores the clear and convincing weight of the evidence.") (internal quotation marks omitted). The Appellate Court of Illinois is the last state court to have adjudicated Gill's claims on the merits. *People v. Gill*, No. 1-04-0019 (Ill. App. May 11, 2006) (unpublished order) (reproduced at Doc. 74-4); *People v. Gill*, 2015 IL App (1st) 121031-U (Ill. App. Mar. 20, 2015) (reproduced at Doc. 74-11); *People v. Gill*, 2016 IL App (1st) 141799-U (Ill. App. Aug. 26, 2016) (reproduced at Doc. 74-17); *People v. Gill*, No. 1-16-1663 (Ill. App. July 20, 2018) (unpublished order) (reproduced at Doc. 74-24); *People v. Gill*, 2019 IL App (1st) 160255-U (Ill. App.

Mar. 29, 2019) (reproduced at Doc. 74-21). The following sets forth the facts as that court described them, as well as the procedural background of the state court proceedings.

### A. The Murder

Around 10:30 p.m. on June 17, 2000, Jamal Moore was riding in a red Chevrolet Astrovan driven by Frederick Funes when two men opened fire and shot Moore in the back of the head. Doc. 74-4 at 2. Funes continued driving and found a friend, Demetrius Carter, who led him to the hospital. *Ibid*. Moore died the next day from the gunshot wound. *Ibid*. Gasi Pitter ("Gasi") and Gill eventually were arrested and charged with the murder. *Ibid*.

### B. Pretrial Motions

Gill moved to quash his arrest and suppress his post-arrest statements to the police, arguing that the police lacked probable cause to arrest him and ignored his requests for an attorney. *Id*. at 2-3. Gill's most inculpatory statement to the police was that he had been with Gasi the night of the shooting. Doc. 74-11 at 5.

At the motion hearing, Chicago police detective Nick Rossi testified as follows. Rossi reported to the crime scene about 30 minutes after the shooting. Doc. 74-4 at 4. An eyewitness told him that two young Black men in dark clothing had shot at a van. *Ibid*. Rossi then went to the hospital, where two officers had already spoken with Funes and Carter. *Ibid*. The officers reported that Funes was highly emotional and that Carter interpreted Funes's identification of the shooters as Jamaicans known as "Junior" and "Dred," nicknames for Gasi and his brother Greg Pitter ("Greg"). *Ibid*. The police went to Greg's apartment, discovered narcotics, and placed him under arrest. *Ibid*. Rossi understood "Dred" as a shorthand description of the shooters, not as an identification of any particular person. *Ibid*.

2

Gill testified at the hearing as follows. On June 18, the day after the shooting, he voluntarily went to the police station around 8:30 p.m. with Gasi, Gasi's father, a friend of Gasi's father, and Gasi's girlfriend, Nadia Holness. *Id*. at 3. The group went to the station because Greg was in custody, though they did not know at the time that he was being held in connection with Moore's murder. *Ibid*. The police asked Gill for an interview, and he agreed. *Ibid*. Gill was not allowed to leave the interview room until he was placed in a lineup four days later, and he was never read his *Miranda* rights. *Ibid*. Gill was given only one sandwich and one soda, and he was allowed to use the restroom only once from the night of June 18 until the morning of June 23. *Ibid*.

Rossi's testimony about what happened at the station differed from Gill's. According to Rossi, when the group came to the station on June 18, he and his partner interviewed Holness. *Id*. at 4. Holness began by providing an alibi for Gasi, but after Rossi advised her of the seriousness of the situation, she admitted that Gasi had been out all night, that Gasi appeared at her home after 11:00 p.m. with "Legend," and that the pair were evasive about what they had been doing. *Id*. at 4-5. Because "Legend" was Gill's nickname, Rossi asked to interview Gasi and Gill. *Id*. at 5. Rossi advised Gill of his *Miranda* rights. *Ibid*. During his interrogation, Gill claimed to have been with Gasi all night and to know nothing about any shooting. *Ibid*. Early in the evening of June 19, Gill was permitted to call his mother. *Ibid*. Later that evening, he was placed in a lineup. *Ibid*. Both Funes and Tamara Adams, a witness to the shooting, identified Gill as one of the shooters. *Ibid*. At 8:20 p.m., Gill was formally arrested. *Ibid*.

The trial court denied Gill's motions to quash and suppress, finding that his testimony lacked credibility. *Ibid*. The court also concluded that the witness interviews gave the police probable cause to detain Gill at the station. *Ibid*.

C.     Trial

Gill and Gasi were tried for the first-degree murder of Moore in a joint trial before separate juries. *Id*. at 1.

Funes testified as follows. Funes had pleaded guilty to residential burglary in 1996 and received probation, and at the time of trial he was again on probation after pleading guilty to breaking and entering and possession of burglary tools. *Id*. at 6. Moore had been Funes's best friend, and at the time of the shooting they were driving around to find their friend Kevin. *Ibid*. While Moore was driving, Funes saw Gill, Gasi, Michelle Clark, and Adams on a street corner. *Ibid*. Moore was driving "funny" due to being an inexperienced driver, so Funes took over. *Ibid*. Funes circled the block and saw only Clark and Adams on the corner. *Ibid*. Funes pulled up to ask if they had seen Kevin, at which point he heard gunshots coming from behind the van on the passenger side. *Ibid*. Funes saw in the passenger's side mirror that Gasi was firing a gun and in the driver's side mirror that Gill was running and firing a gun at them. *Ibid*. Funes continued driving. *Ibid*. He turned down an alley, pulled over, discovered that Moore had been shot in the back of the head, and began driving to find a hospital. *Ibid*. He found Carter, who led him to one. *Ibid*. Funes spoke with police at the hospital and at the police station, and he identified Gill and Gasi in a lineup two days after the shooting. *Id*. at 7.

On cross-examination, Funes was asked why he had told the police that "Dred" was at the scene of the crime. *Ibid*. Funes answered that "Dred" referred to a group, not an individual. *Ibid*. Funes explained that he could not remember the shooters' names, but that he knew they were often with Greg and spoke with thick accents, so he knew that the reference to "Dred" would assist Carter, who was helping him talk to the police, identify the shooters. *Ibid*. Funes admitted that he never saw a gun in Gill's hands, but he asserted that he knew Gill had a gun

because he heard gunshots and saw, through the driver's side mirror, sparks coming from Gill's hands. *Ibid*.

Adams testified next. *Ibid*. She was friends with Gasi, Funes, and Moore, and she had not previously known Gill. *Ibid*. The night of the shooting, Adams was on the street corner drinking with Clark, Gill, Gasi, and a man called "Cosmo." *Ibid*. When Moore and Funes pulled up in the van, she talked to Moore, who sat in the passenger's seat, while Funes sat in the driver's seat. While Moore and Adams spoke, Funes, Gasi, and Gill stared at each other. *Id*. at 7-8. About thirty seconds later, the van passed by again, and Gill and Gasi ran under and past a nearby viaduct. *Id*. at 8. About a minute later, the van passed by again, and Adams saw Gill and Gasi walking back toward the street corner. *Ibid*. Gill and Gasi then ran toward the van, and Adams heard gunshots and saw fire coming from Gill's hand, though she did not actually see a gun. *Ibid*. Adams fell to the ground to get out of the way. *Ibid*. She then saw Gasi remove Clark's daughter from Clark's vehicle and drive off with Gill. *Ibid*.

When Adams was interviewed at the police station, she stated—contrary to her trial testimony—that Gill emerged first from the viaduct and was the shooter, while Gasi split off toward Clark's vehicle. *Ibid*. In a lineup at the police station, she identified Gill and Gasi as the men involved in the shooting. *Ibid*.

Chicago police officer Leonard Stocker testified as follows. Stocker and his partner processed the scene and found five shell casings and no other physical evidence. *Ibid*. They examined Funes's van and found bullet damage to the rear passenger side window and blood on the passenger seat. *Id*. at 8-9. The parties stipulated that a forensic scientist would testify that all shell casings and the bullet recovered from Moore's skull were the same caliber and that the casings were from the same gun. *Id*. at 9.

5

Clark testified as follows. *Ibid.* She and her six-year-old daughter had gone to a store on the street corner sometime after 10 p.m. *Ibid.* Clark drank brandy on the corner with Adams, Gill, Gasi, and Cosmo, while her daughter stayed in Holness's vehicle, which was parked nearby. *Ibid.* Clark knew Funes and had an intimate relationship with Moore. *Ibid.* Funes's van slowed down near them before continuing along, and Clark heard Gill and Gasi say something like "let's get it," or "let's do it," though she was not sure given their thick accents. *Ibid.* Gill and Gasi ran off under the viaduct, toward Gasi's brother's house. *Ibid.* A few minutes later, the van came by again. *Ibid.* When it was pulling away, Clark saw Gasi running ahead of Gill toward the van and heard five gunshots coming from somewhere near Gasi. *Ibid.* She also saw a silver handgun in his Gill's hand. *Ibid.* Clark got her daughter out of Holness's vehicle; Gill and Gasi ran toward it, entered, and drove off. *Id.* at 9-10. Clark gave her account to the police on June 21, four days after the shooting. *Id.* at 10. On cross-examination, she testified that she saw Gill holding the gun at his side but did not see him fire it. *Ibid.*

After the prosecution rested, Gill called Detective Rossi to testify. *Ibid.* While Rossi's trial testimony was largely consistent with his testimony at the pretrial motion hearing, at trial he testified that he did not recall seeing Funes at the hospital and did not believe he talked to Carter there, though he did recall talking to Funes and Carter at the station early in the morning of June 18. *Ibid.*

Gill testified as follows. Gill's cousin, Cleveland Harris, picked Gill up at his home and drove to Harris's home around 6:00 or 6:30 p.m. on June 17. *Ibid.* They stayed at Harris's home until after 11:00 p.m., when Gill received a page from Gasi. *Ibid.* At 11:30 p.m., Harris dropped Gill off at Gasi's "baby's mother's house," which this court understands to mean Holness's house. *Ibid.*; Doc. 74-1 at 25; Doc. 74-2 at 10, 17. Gill denied being on the street corner with

Adams, Clark, Gasi, and Cosmo.  Doc. 74-4 at 10.  He went to the police station on June 18

because Gasi asked him to come find out why Greg was in jail.  *Ibid*.

On cross-examination, Gill testified that he had known Gasi for about two years, had met

Greg once, had never met Adams, did not know Cosmo, and had previously had a single sexual

encounter with Clark that ended with an argument.  *Id*. at 10-11.  Gill admitted that Rossi gave

him *Miranda* warnings before interviewing him at the station.  *Id*. at 11.  Gill admitted telling

Rossi that Gasi had picked him up at 3:00 p.m. on June 17 and that he and Gasi had taken Gasi's

child to a babysitter around 7:00 or 7:30 p.m.  *Ibid*.  Gill testified that he did not recall telling

Rossi that he and Gasi had picked up Gasi's child at 9:00 p.m. or 9:30 p.m. and then taken the

child to the home of "Arlene Holness," which this court understands to refer to Nadia Holness.

*Ibid*.; Doc. 74-2 at 10.  Gill admitted telling Rossi that he, Holness, and Gasi had watched

television at that home, but he testified that they did so only after Harris had dropped him off

sometime after 11:00 p.m.  Doc. 74-4 at 10.

On re-direct, defense counsel asked Gill why at the station he told the police, contrary to

his trial testimony, that he had been with Gasi rather than Harris the night of the shooting.  *Ibid*.

The trial court sustained the prosecutor's hearsay objection.  *Id*. at 11, 23-25.  When defense

counsel explained that the question was intended to allow Gill to explain his statement to the

police, the trial judge asked Gill, "Yes or no? Was there a reason for saying what you said?"  *Id*.

at 11.  Gill responded, "No."  *Ibid*.  Rossi was recalled to again testify to what Gill had told him

at the station, which was that Gill was with Gasi the night of the shooting and that Gill fell asleep

at Holness's house.  *Ibid*.

In closing argument, the prosecutor showed the jury a morgue photograph of Moore.  *Id*.

at 28.  The prosecutor stated: "[T]his is what … Jamal [Moore] looked like … . And this is what

you look like after you meet Legend." *Id*. at 29. Gill's counsel had objected to the use of the photograph during the trial, prior to closing arguments. *Id*. at 28. The State responded that it would use the photograph only to illustrate the medical examiner's testimony. *Ibid*. The court overruled Gill's objection, holding that the photograph, which had already been admitted into evidence, was not gruesome, as it merely showed Moore with a black eye and Moore's fatal injury had been testified to during trial. *Ibid*. Gill's counsel did not object to the use of the photograph again during closing arguments, but he did argue generally in his motion for a new trial that Gill had not received a fair and impartial trial. *Id*. at 29.

The prosecutor also argued during closing that Gill had failed to present a witness to corroborate his alibi that he had been with Harris the night of the shooting. *Id*. at 30. And in discussing inconsistencies among the prosecution witnesses' testimony, the prosecutor stated that "if everybody came in and told the same story all the time about what happened then in effect we would only need one juror. … People see things differently. People hear things differently." *Id*. at 32. The prosecutor then misstated evidence, claiming that Funes, Adams, and Clark all had testified that they had seen Gill holding a gun. *Id*. at 34. But the prosecutor then corrected the misstatement, accurately stating twice that only Clark had testified to having actually seen a gun in Gill's hand. *Ibid*.

The jury found Gill guilty of first-degree murder and further found that he personally fired the firearm that killed Moore. *Id*. at 11-12. After denying Gill's motion for a new trial, the court sentenced him to 40 years' imprisonment for first-degree murder and, under a sentencing enhancement statute, a consecutive prison term of 25 years for personally discharging the firearm that killed Moore. *Id*. at 12.

D.      **Direct Appeal**

Gill pressed five claims on direct appeal: (1) the State failed to prove guilt beyond a reasonable doubt; (2) he was denied his constitutional right to the effective assistance of trial counsel; (3) he was denied his constitutional right to testify and present a defense; (4) the prosecutor's closing argument violated his right to a fair and impartial trial; (5) the sentencing enhancement statute was unconstitutional because it imposed additional punishment for an element inherent in the first-degree murder offense itself.  *Id*. at 2.

1.      **Sufficiency of the Evidence**

For his sufficiency of the evidence argument, Gill contended that the State's case turned on eyewitnesses—Funes, Adams, and Clark—who were inconsistent, biased, and not credible. *Id*. at 12.  The state appellate court observed that the question whether to credit eyewitness accounts was up to the jury.  *Id*. at 15-16.  The court held that the evidence, viewed in the light most favorable to the prosecution, "overwhelmingly showed that Gill was present the night of the incident and fired a gun at Funes' van."  *Id*. at 16.

2.      **Ineffective Assistance of Counsel**

Gill offered three reasons why he did not receive the effective assistance of trial counsel. First, he argued that counsel failed to effectively cross-examine Funes or diminish his credibility, and that counsel should have deployed the approach that Gasi's counsel had used.  *Id*. at 17-18. Gasi's counsel elicited testimony from Funes that he had told the police that the shooter had short dreadlocks, which Gill argued would have supported his theory that either "Dred" or "Cosmo" was the shooter.  *Id*. at 18.

The appellate court disagreed, holding that Gill's counsel had pursued a "perfectly reasonable" defense strategy of highlighting differences between Funes's testimony and a prior

written statement, a strategy that established that Funes had not actually seen a gun in Gill's hands. *Ibid*. Gill further argued that his trial counsel should have, like Gasi's counsel, tested whether Funes—who was then on probation—was biased due to assistance he would receive from the State in exchange for his testimony. *Id*. at 6, 18. The appellate court determined that not pursuing that line of question was reasonable given that Funes had testified in response to questioning from Gasi's counsel that the State had promised him nothing in return for his testimony. *Id*. at 18.

Second, Gill contended that his counsel was ineffective for failing to impeach Funes's and Rossi's credibility by highlighting their inconsistent statements. *Id*. at 19. Funes told the police that he knew Moore for seven years; yet at trial he testified that he knew Moore for just two or three years before saying on cross-examination that he knew him for "only five [years] or something." *Ibid*. And Rossi, as noted, testified at a pretrial hearing that Funes and Carter had told him at the hospital that "Junior" and "Dred" were the shooters, while at trial he testified that he did not recall seeing Funes or speaking with Carter at the hospital, though he did recall seeing them later at the station. *Ibid*. Gill maintained that highlighting the inconsistency would have supported his theory that someone with dreadlocks had committed the shooting. Doc. 74-1 at 36-37.

The appellate court rejected Gill's argument that his counsel was inadequate for not highlighting those inconsistent statements. Doc. 74-4 at 20-21. The court explained that impeaching Rossi would not necessarily have corroborated Gill's theory because Rossi said at the pretrial hearing that he did not understand "Dred" to refer to a particular person and because Rossi's pretrial testimony would only have strengthened Funes's identification of Gill. *Ibid*. The court further explained that undermining Rossi's and Funes's credibility would not have

overcome other evidence demonstrating Gill's guilt, including the testimony of two witnesses (in addition to Funes) who testified that they saw Gill holding or firing a gun. *Ibid.*

Third, Gill argued that his counsel should have objected to the State's use of the morgue photograph—accompanied by the statement, "this is what you look like after you meet Legend"—in its closing argument and the prosecutor's misstatement that "all" witnesses saw Gill with a gun. *Id.* at 21, 29. The appellate court disagreed, holding that neither the photograph nor the remarks prejudiced Gill. *Id.* at 22. As to the prosecutor's misstatement of the evidence, the court noted that the prosecutor corrected the misstatement and defense counsel emphasized the correct testimony in his closing. *Ibid.*

### 3. Constitutional Right to Testify and Present a Defense

Gill argued that he was denied his constitutional right to testify and present a defense because the trial court prevented him from testifying that Gasi had told him to tell the police that the two were together at the time of the shooting. *Id.* at 11, 22-23. The appellate court agreed with Gill that the testimony was improperly excluded because it was admissible under a hearsay exception. *Id.* at 25. The court held that a new trial was unwarranted, however, because other evidence was more than sufficient to fatally undermine Gill's alibi that he was with Harris, not Gasi, at the time of the shooting. *Id.* at 27. The court added that permitting Gill's testimony— which was inconsistent with that of three eyewitnesses and demonstrated Gill's willingness to lie—might have even undermined his credibility further. *Ibid.*

### 4. Prosecutorial Misconduct in Closing Argument

Gill maintained that the prosecutor committed misconduct in closing arguments. *Id.* at 27-28. First, he argued that the prosecutor used Moore's morgue photograph to inflame the jurors and threaten them into returning a guilty verdict. *Id.* at 28-29. (The appellate court found

11

that Gill had not forfeited the issue despite failing to object during closing arguments. *Ibid*.)
The appellate court disagreed, explaining that the photograph had been testified to at trial and
entered into evidence prior to closing arguments, and that it was not so gruesome as to prejudice
the jury. *Id*. at 30. The court held that that the prosecutor's comments regarding the
photograph—"[T]his is what … Jamal [Moore] looked like … . And this is what you look like
after you meet Legend"—conveyed only that Gill was dangerous and thus, in context, was not a
threat to the jury. *Id*. at 29-30.

Second, Gill challenged the prosecutor's comment about his failure to present an alibi
witness. *Id*. at 30. Counsel for both sides had discussed during a sidebar that Harris, a potential
alibi witness, was out of the country and unavailable, but the prosecutor stated in his rebuttal
closing that Gill had failed to present Harris or any other witness to corroborate his alibi. *Ibid*.
The appellate court held that the prosecutor's comment was proper because Gill had put his alibi
at issue with his own testimony and his counsel's closing argument that he was with Harris, not
Gill, at the time of the shooting. *Ibid*.

Third, Gill argued that the prosecutor minimized the State's burden of proof by
suggesting that inconsistencies among witnesses are not only inevitable, but also the reason why
twelve jurors are needed to determine what happened. *Id*. at 31-32. The appellate court
disagreed. *Ibid*. Gill's counsel argued extensively about the inconsistencies in the witnesses'
testimony, and in rebuttal the prosecutor explained that it was the jury's duty to resolve the
factual questions arising from those inconsistencies. *Id*. at 33. The court explained that,
understood in context, the prosecutor's statements did not mischaracterize the State's burden of
proof. *Ibid*.

Last, Gill argued that the prosecutor's misstatement that all the eyewitnesses had seen the gun in Gill's hand was prosecutorial misconduct and violated his right to a fair and impartial trial. *Id*. at 34. The appellate court held that the prosecutor's misstatement was not prejudicial because she corrected it, the State's case did not rely heavily on the misstatement, defense counsel reiterated the correct version of the testimony, and the trial court properly instructed the jury to disregard comments from closing arguments that were not supported in the record. *Ibid*.

### 5. Constitutionality of Sentencing Enhancement

Finally, Gill attacked the constitutionality of the statute subjecting him to the 25-year sentence enhancement for personally firing the gun that killed Moore. *Ibid*. The appellate court rejected the argument because it was squarely foreclosed by *People v. Sharpe*, 839 N.E.2d 492 (Ill. 2005). Doc. 74-4 at 35.

\* \* \*

Gill filed a petition for leave to appeal ("PLA") in the Supreme Court of Illinois, presenting five claims: (1) the State failed to prove its case beyond a reasonable doubt; (2) he was denied the effective assistance of counsel because trial counsel failed to request a continuance for the alibi witness to return, failed to effectively cross-examine and impeach eyewitnesses, and failed to object to misstatements in the State's closing, and because appellate counsel failed to effectively press the alibi witness issue; (3) he was denied his right to testify and present a defense when the trial court prevented him from explaining why he had lied to the police; (4) the prosecutor's closing argument deprived him of his right to a fair trial by improperly using the morgue photo, shifting the burden of proof, minimizing the State's burden, and misstating evidence; and (5) the 25-year sentencing enhancement can constitutionally apply only where there is a victim other than the murder victim. Doc. 74-1; Doc. 74-5 at 3-8. The

state supreme court denied the PLA. *People v. Gill*, 857 N.E.2d 677 (Ill. 2006) (reproduced at Doc. 74-6).

### E. State Postconviction Proceedings

#### 1. Postconviction Petition

In December 2006, Gill filed a postconviction petition under the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1. Doc. 74-34 at 40. The petition, as amended, claimed that: (1) appellate counsel was ineffective for not challenging the lawfulness of Gill's arrest and the trial court's denial of his motion to suppress; and (2) he was denied notice of the charges against him because the State sought to convict him on an accountability theory even though the indictment did not set forth that theory of culpability. *Id*. at 75-86.

The trial court denied the petition. *Id*. at 197-201. It held that Gill suffered no prejudice from appellate counsel's failure to challenge his arrest and denial of his motion to suppress because counsel could reasonably have believed that those arguments lacked merit and would not succeed. *Id*. at 198-99. The court found Gill's claim as to notice of the accountability theory triply defective. First, the court explained that due process does not require the indictment to specify a theory of criminal accountability. *Id*. at 200. Second, the guilty verdict did not turn on an accountability theory because the jury found—based on "overwhelming" evidence—that Gill fired the shot that killed Moore. *Id*. at 200-201. And third, Gill had waived the argument by failing to raise it on direct appeal. *Id*. at 201.

Gill raised the same two issues on appeal. Docs. 74-7, 74-8. The appellate court affirmed. *People v. Gill*, 2015 IL App (1st) 121031-U (Ill. App. Mar. 20, 2015) (reproduced at Doc. 74-11). Gill filed a PLA, Doc. 74-12, which was denied. *People v. Gill*, 32 N.E.3d 675 (Ill. 2015) (reproduced at Doc. 74-13).

### 2.    Petition for Relief from Judgment

In March 2014—before the appellate court affirmed the denial of his postconviction petition—Gill filed a petition for relief from judgment under 735 ILCS 5/2-1401. Doc. 74-36 at 48-58. He claimed that application of the 25-year sentencing enhancement was unconstitutional because the enhancement was not alleged in the indictment and was unconstitutionally disproportionate to his offense. *Id*. at 50-58. The trial court dismissed the petition as meritless. *Id*. at 65-70. Gill appealed on the ground that the trial court erred by dismissing the petition before he served the State. Doc. 74-14. The state appellate court affirmed. *People v. Gill*, 2016 IL App (1st) 141799-U (Ill. App. Aug. 26, 2016) (reproduced at Doc. 74-17). Gill did not file a PLA.

### 3.    First Successive Postconviction Petition

In August 2015, Gill moved for leave to file a successive postconviction petition, claiming that newly discovered evidence supported his actual innocence and that the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that evidence. Doc. 74-38 at 51-57. The trial court denied leave to file on the ground that the newly discovered evidence likely would not change the result on retrial given the "overwhelming" evidence of guilt. *Id*. at 77-78.

Gill appealed, and the appellate court consolidated the appeal with Gill's appeal from the denial of leave to file his third successive postconviction petition. Doc 74-18 at 7 n.2; Doc. 74-21 at 1-2. In briefing the consolidated appeal, Gill failed to challenge the denial of his petition for leave to file the first successive postconviction petition, and the state appellate court accordingly affirmed as to that denial. Doc. 74-21 at 14-15. Gill did not file a PLA.

### 4.     Second Successive Postconviction Petition

In February 2016, Gill moved for leave to file a second successive postconviction petition, claiming that the State violated *Brady* by failing to disclose that one of the arresting officers had been accused of misconduct in other cases, that his trial counsel was ineffective by failing to conduct an investigation that would have uncovered those accusations, and that Rossi committed perjury at the pretrial hearing on the motions to suppress and quash arrest. Doc. 74-40 at 24-43.  The trial court denied leave on the ground that Gill failed to establish cause and prejudice as required under 725 ILCS 5/122-1(f).  *Id*. at 68-72.

On appeal, appointed counsel moved to withdraw because no issues of arguable merit could be raised.  Doc. 74-22.  The appellate court granted counsel's motion and affirmed the trial court's decision.  Doc. 74-24.  Gill filed a PLA, raising the *Brady* and ineffective assistance claims.  Doc. 74-25.  The state supreme court denied the PLA.  *People v. Gill*, 108 N.E.3d 885 (Ill. 2018) (reproduced at Doc. 74-26).

### 5.     Third Successive Postconviction Petition

In September 2016, Gill moved for leave to file a third successive postconviction petition, claiming that newly discovered evidence—testimony from a newly discovered witness—supported his actual innocence.  Doc. 74-41.  The trial court denied leave on the ground that overwhelming evidence established that Gill was the shooter and that the newly discovered witness was hesitant to testify.  Doc. 74-21 at 13.

The appellate court reversed on the ground that Gill had presented a colorable claim of actual innocence and remanded for further postconviction proceedings.  *Id*. at 17-18.  To this court's knowledge, those proceedings are ongoing.  Gill moved to stay this habeas case while he

16

pursued his actual innocence claim in state court, Doc. 59, but this court denied a stay because the postconviction proceeding does not raise a cognizable federal habeas claim, Doc. 64.

## Discussion

Gill's federal habeas petition asserts twelve claims, described below.

## I.     Procedurally Defaulted Claims (Claims 6-7, 10-11)

A federal habeas claim is "procedurally defaulted when a petitioner fails to 'fairly present' his claim to the state courts." *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014). "To fairly present his federal claim, a petitioner must assert that claim throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in post-conviction proceedings." *Ibid.* (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). That means that the petitioner, on either direct or postconviction review, must have "present[ed] the contention to each level of the state judiciary." *Bland v. Hardy*, 672 F.3d 445, 449 (7th Cir. 2012). Accordingly, "[a] procedural default occurs where a habeas petitioner has exhausted his state court remedies without properly asserting his federal claim at each level of state court review." *Crockett v. Hulick*, 542 F.3d 1183, 1192 (7th Cir. 2008) (internal quotation marks omitted). In Illinois, exhaustion of remedies requires presenting the claim to the Supreme Court of Illinois. *See Boerckel*, 526 U.S. at 845-46.

Additionally, to preserve a claim for federal habeas review, the petitioner must "have made clear [to the state courts] that it was indeed a federal constitutional claim that he was pressing." *McKinley v. Butler*, 809 F.3d 908, 909 (7th Cir. 2016). To fairly present a federal claim, the petitioner must supply the state court with "both the operative facts and the 'controlling legal principles'" underlying the claim, *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992) (quoting *Picard v. Connor*, 404 U.S. 270, 277 (1971)), and must alert the state court

to the claim's "federal nature," *Baldwin v. Reese*, 541 U.S. 27, 30-31 (2004). Four factors govern whether the state court was sufficiently alerted to the presence of a federal claim: "1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." *Hicks v. Hepp*, 871 F.3d 513, 531 (7th Cir. 2017).

Procedural default also may result "[w]hen the last state court to issue an opinion on a petitioner's federal claim has resolved that claim on an adequate and independent state ground." *Miranda v. Leibach*, 394 F.3d 984, 991-92 (7th Cir. 2005). "Typically this occurs when the petitioner failed to comply with a state procedural rule and the state court relied on that procedural default to refrain from reaching the merits of the federal claim." *Ibid*. A state reviewing court's determination that a petitioner waived or forfeited a claim is "an adequate and independent state ground for a decision." *Franklin v. Gilmore*, 188 F.3d 877, 886 (7th Cir. 1999); *see also Richardson*, 745 F.3d at 268 (holding that a federal habeas claim is "procedurally defaulted through a petitioner's initial failure to preserve it with an objection, even if the petitioner later does attempt to present it for review").

### A.    Claims 6 and 10

Claim 6 alleges that Illinois's 25-year firearm sentencing enhancement statute imposes an impermissible double enhancement, in violation of the Fourteenth Amendment, while Claim 10 alleges that the statute violates due process by punishing murders committed with a firearm more severely than other murders. Doc. 49 at 45-48, 62-70. The Warden argues that Gill procedurally

defaulted those claims by not alerting the state appellate court to their federal nature. Doc. 73 at 17-19. Gill responds that the "substance of [his] constitutional claims [was] raised in his state court brief" on direct appeal. Doc. 75 at 2.

The Warden is correct. Although Gill perfunctorily cited the Fifth and Fourteenth Amendments in his opening brief on direct appeal, Doc. 74-1 at 78-80, the cases and legal reasoning he presented were grounded in the Illinois Constitution, not the United States Constitution. Doc. 74-1 at 73-80; Doc. 74-3 at 23-25. He therefore did not fairly present a federal constitutional claim. *See Wilson v. Briley*, 243 F.3d 325, 328 (7th Cir. 2001) (holding that the petitioner did not fairly present his federal claims in state court where "[h]e relied exclusively upon Illinois cases, none of which employed a federal constitutional analysis"); *see also Lieberman v. Thomas*, 505 F.3d 665, 670 (7th Cir. 2007) (similar).

Gill may overcome his procedural default of Claims 6 and 10 either by demonstrating cause and prejudice or by showing that this court's failure to consider those claims would result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010). He does not make either argument, so the default stands. *See Perruquet v. Briley*, 390 F.3d 505, 515 (7th Cir. 2004) (holding that the petitioner bears the burden of demonstrating an exception to procedural default); *Franklin*, 188 F.3d at 884 ("[P]rocedural default will be excused if a defendant can show that a failure to review the defendant's claims would result in a fundamental miscarriage of justice. [The petitioner], however, does not make this argument and we will not make it for him.") (citation omitted).

### B.    Claim 11

Claim 11 alleges that the state courts erred in denying him leave to file his first successive postconviction petition, which, as noted, claimed that newly discovered evidence

demonstrated his actual innocence and that the State violated *Brady* by failing to disclose that evidence. Doc. 49 at 67-70. This claim is procedurally defaulted because Gill did not challenge on appeal the trial court's denial of his motion to reconsider the denial of leave to file his first successive postconviction petition. Doc. 74-21 at 14. Gill contends that the procedural default should be excused because denying him the ability to press his *Brady* claim here would result in a fundamental miscarriage of justice given that he is actually innocent. Doc. 75 at 3.

"The fundamental miscarriage of justice standard erects an extremely high bar for the habeas petitioner to clear. It applies only in the rare case where the petitioner can prove that he is actually innocent of the crime of which he has been convicted." *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013); *see also Blackmon v. Williams*, 823 F.3d 1088, 1101 (7th Cir. 2016) (holding that the standard "is demanding and permits federal court review only in the extraordinary case") (internal quotation marks and brackets omitted). "To pass through th[is] actual-innocence gateway to a merits review of … procedurally barred claim[s], [a] petitioner must have 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). "'New evidence' in this context does not mean 'newly *discovered* evidence'; it just means evidence that was not presented at trial." *Ibid*. "The petitioner must prove, based on this evidence, that it was more likely than not that no jury would have convicted him at trial were the new, exculpatory evidence available." *McDowell*, 737 F.3d at 483. "[B]ecause an actual-innocence claim [necessarily] involves evidence the trial jury did not have before it," a federal habeas court must evaluate "how reasonable jurors would react to the overall, newly supplemented record." *Jones*, 842 F.3d at 461 (internal quotation marks omitted).

Gill's new evidence is Elijah Stewart's eyewitness testimony. Doc. 49 at 67-69. In an affidavit attached to Gill's motion for leave to file his first successive postconviction petition, Stewart averred that he and his mother witnessed the shooting, that it was committed by two Black men, one with dreadlocks, and that he and his mother did not recognize the shooter in a photo array that the police showed them. Doc. 74-38 at 58. Stewart also averred that "[t]he person [whom he] saw [commit the] shooting and describe[d] to the police was not [Gill]." *Id*. at 59. Stewart and Gill met in prison in May 2014, at which time he disclosed to Gill his supposed knowledge of the shooting. *Ibid*.

This court must review the record that would have been available to the jury had Stewart testified at trial consistent with his affidavit. Two witnesses—Funes and Clark—testified that they saw Gill shooting at Funes's van, while Clark testified that she saw Gill holding a handgun, though she did not see him shoot it. Stewart, by contrast, would have testified that he saw the shooting and that Gill was not the shooter. True enough, some other evidence at trial suggested that "Dred"—perhaps meaning Greg—not Gill, was the shooter. Doc. 74-4 at 7. Yet given Funes's, Adams's, and Clark's consistent eyewitness accounts that Gill was the shooter, this court cannot conclude that it is more likely than not that no reasonable trier of fact would have convicted Gill if Stewart had testified. It follows that Gill's newly discovered evidence does not allow him to pass through the actual innocence gateway. *See Blackmon*, 823 F.3d at 1101-02 (holding that testimony from two new witnesses that the petitioner was not the shooter "d[id] not meet th[e] demanding [*Schlup*] standard for actual innocence"—even though "no physical evidence tied him to the murder, and the State introduced no evidence of a motive"—where two other eyewitnesses had testified that he was the shooter); *Gladney v. Pollard*, 799 F.3d 889, 899 (7th Cir. 2015) (holding that new evidence permitting a "possible inference but by no means a

required [inference]" of the petitioner's innocence did not meet his "heavy burden" of showing that "it is likely that *no* reasonable juror would have convicted"); *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) (holding that the fundamental miscarriage of justice exception did not apply where six eyewitnesses identified the defendant, even though six alibi witnesses had failed to testify at trial). Because Gill "has not shown the miscarriage of justice needed to excuse his procedural default, [this court] do[es] not consider the merits of [his procedurally defaulted] claim." *Blackmon*, 823 F.3d at 1102.

C.      **Claim 7**

Claim 7 alleges that the State violated *Brady* by failing to disclose accusations of misconduct in other cases against one of the arresting officers, and that trial counsel was ineffective in not uncovering those accusations. Doc. 49 at 49-52. As explained, Gill attempted to raise this claim in a second successive postconviction petition, but the state trial court denied his motion to file the petition because he failed to established cause and prejudice as required under 725 ILCS 5/122-1(f). The Warden correctly argues that the claim is procedurally defaulted on adequate and independent state law grounds. Doc. 74-40 at 72; *see Thomas v. Williams*, 822 F.3d 378, 385 (7th Cir. 2016) (holding that 725 ILCS 5/122-1(f) "is an adequate and independent state ground precluding federal habeas review"). Additionally, Gill does not respond to the Warden's procedural default argument in his reply brief, Doc. 75 at 1-3, thereby forfeiting any argument that his claim is not procedurally defaulted. *See Webb v. Frawley*, 906 F.3d 569, 581 (7th Cir. 2018) ("Webb has waived any counterarguments he may have had by not responding to Frawley's argument on this topic in his reply brief.").

## II.     Noncognizable Claim (Claim 5)

Claim 5 alleges that the state courts should have interpreted Illinois's 25-year firearm sentencing enhancement statute to apply only to non-homicide offenses or to homicide offenses where there is a victim other than the homicide victim. Doc. 49 at 38-44. The claim alleges an error of state law, which is not cognizable on federal habeas review. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.") (internal quotation marks omitted); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

## III.    Moot Claim (Claim 12)

Claim 12 alleges that the state courts erred in denying Gill leave to file his third successive postconviction petition. Doc. 49 at 71-81. After Gill filed this federal habeas case, the state appellate court reversed the trial court's denial of leave and remanded for further postconviction proceedings. Doc. 74-21. Because Gill has received all the relief he seeks on this claim, it is moot. *See Allen v. Duckworth*, 6 F.3d 458, 460 (7th Cir. 1993) (holding that a habeas claim based on the state court's delay in resolving an appeal became moot when the state court decided the appeal).

## IV.     Claims Failing on the Merits (Claims 1-4, 8-9)

"Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of th[e] [Supreme] Court, § 2254(d)(1); or that it 'involved an unreasonable application of' such law, § 2254(d)(1); or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2)." *Harrington v. Richter*, 562

U.S. 86, 100 (2011) (citation omitted); *see also Gilbert v. McCulloch*, 776 F.3d 487, 491-92 (7th Cir. 2015).

As to § 2254(d)(1), a state court's decision is "contrary to" clearly established federal law if the court "applies the wrong legal standard established by Supreme Court precedent or decides a case differently than the Supreme Court on materially indistinguishable facts." *Kamlager v. Pollard*, 715 F.3d 1010, 1015 (7th Cir. 2013) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). The "lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since 'a general standard' from [the Supreme Court's] cases can supply such law." *Gilbert*, 776 F.3d at 491 (alteration in original) (quoting *Marshall v. Rodgers*, 569 U.S. 58, 62 (2013)). Still, the "contrary to" standard is "difficult to meet," as "clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of th[e] [Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks omitted).

"Alternatively, a state court decision involves an 'unreasonable application of' federal law [under § 2254(d)(1)] if the state court 'correctly identifies the governing legal principle … but unreasonably applies it to the facts of the particular case.'" *Kamlager*, 715 F.3d at 1015-16 (ellipsis in original) (citing *Bell*, 535 U.S. at 694). To obtain relief under the "unreasonable application" prong of § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Wheeler*, 577 U.S. 73, 77 (2015) (internal quotation marks omitted). "[A] federal habeas court may overturn a state court's application of federal law only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's

24

decision conflicts with th[e] [Supreme] Court's precedents." *Nevada v. Jackson*, 569 U.S. 505,

508-09 (2013) (internal quotation marks omitted).

### A.    Claim 1

Claim 1 alleges that the evidence presented at trial was insufficient to sustain Gill's

conviction. The state appellate court correctly identified the governing rule for an insufficient

evidence claim as stated in *Jackson v. Virginia*, 443 U.S. 307 (1979). Doc. 74-4 at 12 (citing

*People v. Bush*, 827 N.E.2d 455, 460 (Ill. 2005), which in turn cites *Jackson*). Under *Jackson*, a

sufficiency of the evidence claim fails if, "after viewing the evidence in the light most favorable

to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." 443 U.S. at 319. On federal habeas review, a court "may not

[under § 2254(d)] overturn a state court decision rejecting a sufficiency of the evidence

challenge" unless "the state court decision was objectively unreasonable." *Coleman v. Johnson*,

566 U.S. 650, 651 (2012) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)). With deference to

both the jury's findings and the state court's application of *Jackson*, claims for insufficiency of

the evidence "face a high bar in federal habeas proceedings because they are subject to two

layers of judicial deference." *Ibid*.

Gill argues that the three eyewitnesses—Funes, Clark, and Adams—offered inconsistent

testimony, that Funes was not credible, and that Clark and Adams were biased. Doc. 49 at 4-13.

The appellate court considered these arguments, held that it could not find that Adams and Clark

were biased, and correctly observed that it was the jury's responsibility to make credibility

determinations. Doc. 74-4 at 12-16. Applying the *Jackson* rule, the court explained:

> Ultimately, the jury found sufficient corroborating testimony to establish
> credibility among the witnesses. Viewing the evidence in a light favorable to
> the prosecution, we agree with the State that the evidence overwhelmingly
> showed that Gill was present the night of the incident and fired a gun at

> Funes' van. The inescapable fact is that each witness identified Gill either holding a gun, or made the logical inference that he fired a gun at the van because they heard gunshots and saw sparks come from Gill's hand. While a single eyewitness identification may be enough to support a conviction, three eyewitnesses is overwhelming evidence and we will not disturb the jury's finding.

*Id*. at 16. That decision was not objectively unreasonable, so § 2254(d)(1) precludes this court from disturbing it on habeas review.

### B.  Claim 2

Claim 2 alleges that Gill's trial counsel was constitutionally ineffective in failing to effectively cross-examine witnesses, impeach Rossi, and object to the prosecutor's factual misstatement during closing argument. Doc. 49 at 14-23. Gill argues that the state appellate court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in rejecting his claim.

The state appellate court correctly articulated the *Strickland* standard in evaluating Gill's claim. Doc. 74-4 at 16-17. The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. *See Vinyard v. United States*, 804 F.3d 1218, 1224 (7th Cir. 2015). A defendant claiming ineffective assistance under *Strickland* must show that (1) his attorney's performance was deficient and (2) he suffered prejudice as a result. *See Laux v. Zatecky*, 890 F.3d 666, 673 (7th Cir. 2018). As to deficient performance, a defendant must show that counsel's performance "'fell below an objective standard of reasonableness.'" *Blackmon*, 823 F.3d at 1102-03 (quoting *Strickland*, 466 U.S. at 688). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015) (internal quotation marks omitted). "A court's scrutiny of an attorney's performance is 'highly deferential' to eliminate as much as possible the distorting effects of

hindsight, and [it] 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Vinyard*, 804 F.3d at 1225 (quoting *Strickland*, 466 U.S. at 689); *see also Woods v. Etherton*, 578 U.S. 113, 117 (2016) ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.") (internal quotation marks omitted). As to prejudice, a defendant must show "a reasonable probability that, but for counsel's [allegedly] unprofessional errors, the result of the proceeding would have been different." *Laux*, 890 F.3d at 674 (quoting *Strickland*, 466 U.S. at 694). "When the claim at issue is one for ineffective assistance of counsel, … [federal habeas] review is doubly deferential, … afford[ing] both the state court and the defense attorney the benefit of the doubt." *Woods*, 578 U.S. at 117 (internal quotation marks and citations omitted).

First, Gill contends that his counsel ineffectively cross-examined and impeached witnesses. In his view, counsel did not effectively cross-examine Funes because—unlike Gasi's counsel—he did not question Funes about the possible benefits he could receive as to his own criminal exposure by testifying at trial. Doc. 49 at 14-16. That failure, Gill submits, allowed the prosecutor to argue that Funes had no incentive to pin Moore's murder on the wrong person. *Id.* at 16-17. Additionally, Gill maintains that Gasi's counsel effectively elicited testimony from Funes that Funes had told an officer at the station that the shooter had short dreadlocks, and Gill's counsel was ineffective for not doing the same. *Id.* at 17. Gill further asserts that his counsel was ineffective for not deploying Funes's prior statement that he knew Moore for seven years after he testified that he knew Moore for a shorter period. *Id.* at 17-18.

The state appellate court determined that Gill's counsel's decisions in cross-examining Funes were the result of a reasonable trial strategy and therefore not deficient performance.

Gill's counsel chose to concentrate on differences between Funes's trial testimony and his prior written statement to police. Doc. 74-4 at 18. In so doing, counsel established that Funes had not seen a gun in Gill's hand. *Ibid*. The court also noted that, when questioned by Gasi's counsel, Funes testified that he had been promised nothing by the State and expected no help in return for his testimony, so attempting to impeach Funes's credibility could have been fruitless. *Ibid*. The court's deference to counsel's strategic decisions when cross-examining Funes was not an objectively unreasonable application of *Strickland*. *See McElvaney v. Pollard*, 735 F.3d 528, 532 (7th Cir. 2013) ("In evaluating an attorney's performance, courts must defer to any strategic decision the lawyer made that falls within the wide range of reasonable professional assistance, even if that strategy was ultimately unsuccessful.") (internal quotation marks omitted); *Shaw v. Wilson*, 721 F.3d 908, 914 (7th Cir. 2013) (same).

The state appellate court additionally held that Gill's counsel's decisions in cross-examining Funes did not prejudice Gill because other evidence—including the two other eyewitnesses, Adams and Clark—amply supported the guilty verdict. Doc. 74-4 at 19. Given the substantial other evidence that Gill killed Moore, this court cannot say that the state court unreasonably applied *Strickland*'s prejudice prong.

Next, Gill argues that trial counsel was ineffective for failing to impeach Rossi with a prior inconsistent statement. Specifically, Rossi testified at the pretrial hearing that he had spoken with Funes and Carter at the hospital and that they had told him that "Junior" and "Dred" were the shooters. Doc. 74-4 at 4. At trial, however, Rossi testified that he did not recall speaking to Funes or Carter at the hospital. *Id*. at 10. Gill contends that questioning Rossi as to his pretrial hearing testimony would have bolstered his theory that "Dred"—who perhaps, unlike Gill, had dreadlocks—was the shooter. Doc. 49 at 19-21.

The appellate court held that counsel was not deficient in failing to impeach Rossi in this manner because doing so would have done little to corroborate Gill's theory about a dreadlocked shooter. Doc. 74-4 at 21. At the pretrial hearing, Rossi said that he understood "Dred" as a shorthand for a group, not the name of an individual or a description of the shooter's dreadlocked hair. Doc. 74-4 at 4, 21. The court further held that the failure to impeach Rossi did not prejudice Gill because the other two eyewitnesses, Adams and Clark, testified to Gill's involvement in the shooting. *Id*. at 21. Neither determination unreasonably applied *Strickland*.

Last, Gill contends that trial counsel was ineffective for not objecting to the prosecutor's misstatement in closing argument that all witnesses had seen Gill with a gun. Doc. 49 at 21-22. Applying *Strickland*, the appellate court held that Gill had not established prejudice because the prosecutor corrected that misstatement, defense counsel stressed the pertinent testimony in closing, and there was overwhelming evidence against Gill. Doc. 74-4 at 22. This court agrees that the misstatement did not prejudice Gill, so it follows that the state court did not unreasonably apply *Strickland* in so concluding.

### C.    Claim 3

Claim 3 alleges that Gill was denied his constitutional right to testify and present a defense. Doc. 49 at 24. As noted, the trial court prevented Gill from testifying that he had lied to the police when he told them that he had been with Gasi the night of the shooting. Doc. 74-4 at 11, 25. Specifically, Gill wanted to testify that Gasi had told him to tell the police that they were together—testimony which he maintains would have allowed the jury "to consider whether [Gasi] was involved with his brother or Cosmo." Doc. 49 at 26. The state appellate court agreed that the trial court's ruling was erroneous, but it held the error harmless. Doc. 74-4 at 25-27. The court reasoned that the jury had already heard and considered Gill's alibi, deduced that he

29

"was not wholly truthful to the police," and believed the three eyewitnesses over him. *Id*. at 27. Indeed, the appellate court explained that permitting Gill to give the excluded testimony—that he had lied to the police—would have damaged his credibility, making the jury even more likely to believe the "overwhelming evidence" against him. *Ibid*.

In *Crane v. Kentucky*, 476 U.S. 683 (1986) the Supreme Court held that the "Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Id*. at 690 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  Violations of that right are subject to harmless error analysis. *See id*. at 691; *Alicea v. Gagnon*, 675 F.2d 913, 925 (7th Cir. 1982).  On federal habeas review, a constitutional error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Brown v. Davenport*, 142 S. Ct. 1510, 1519 (2022) ("*Brecht* held that a state prisoner seeking to challenge his conviction in collateral federal proceedings must show that the error had a substantial and injurious effect or influence on the outcome of his trial.") (internal quotation marks omitted); *Jones v. Basinger*, 635 F.3d 1030, 1052 (7th Cir. 2011) ("On habeas review, a constitutional error is considered harmless unless it can be shown to have had substantial and injurious effect or influence in determining the jury's verdict.") (internal quotation marks omitted).  "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637.  "When making a determination under *Brecht*, the reviewing court must make a *de novo* examination of the record as a whole to decide whether a properly instructed jury would have arrived at the same verdict, absent the error." *Czech v. Melvin*, 904 F.3d at 570, 577 (7th Cir. 2018).

The Warden implicitly concedes that Gill's constitutional right to present a complete defense was violated at trial, Doc. 73 at 42-44, so this court will consider only whether the error prejudiced Gill under *Brecht*. It did not. Gill wanted to testify that the reason he lied to the police about being with Gasi was that Gasi had asked him to do so. Doc. 74-4 at 26. That testimony likely would have hurt Gill's credibility with the jury by revealing his willingness to lie. Furthermore, the jury likely would not have believed him in light of the three eyewitnesses who testified, contrary to his trial testimony, that he was at the scene of the shooting. Therefore, any constitutional error in preventing Gill from testifying and presenting a defense did not have a "substantial and injurious effect or influence" on the jury's verdict. *See Armfield v. Nicklaus*, 985 F.3d 536, 547 (7th Cir. 2021) (holding a Confrontation Clause violation harmless under the *Brecht* standard given the significant number of eyewitnesses against the defendant).

### D.     Claim 4

Claim 4 alleges that four aspects of the prosecutor's closing argument deprived Gill of his right to a fair and impartial trial under the Sixth and Fourteenth Amendments. Doc. 49 at 29. First, Gill argues that the display of Moore's morgue photograph inflamed the jury's passions and that the prosecutor scared the jury by saying, "this is what you look like after you meet Legend." *Id*. at 30. Second, Gill contends that the prosecutor's statements about his failure to call alibi witnesses, when the prosecutor knew that one such witness was out of the country, was unfair and misleading and improperly shifted the burden of proof to Gill. *Id*. at 32-33. Third, Gill contends that the prosecutor improperly minimized the State's burden in arguing that discrepancies in witness testimony are common. *Id*. at 33-35. Fourth, Gill challenges the prosecutor's misstatement that all eyewitnesses saw that Gill had a silver automatic handgun. *Id*. at 35-37.

Although Gill presses this claim under the Sixth and Fourteenth Amendments, *id*. at 29, a claim that a state prosecutor's improper closing arguments made a trial unfair arises under only the Fourteenth Amendment. *See Ellison v. Acevedo*, 593 F.3d 625, 635-36 (7th Cir. 2010); *Dortch v. O'Leary*, 863 F.2d 1337, 1345-46 (7th Cir. 1988). Under *Darden v. Wainwright*, 477 U.S. 168 (1986), an inappropriate closing argument violates the Fourteenth Amendment only if the challenged remarks "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. at 181 (internal quotation marks omitted). In evaluating such a claim, a court first evaluates whether the comments were improper. *See Ellison*, 593 F.3d at 635-36. If they were, the court considers several factors to determine whether the defendant was prejudiced: "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut." *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000). To be prejudicial, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Ellison*, 593 F.3d at 636 (quoting *Darden*, 477 U.S. at 181).

On direct appeal, although the state appellate court did not cite *Darden*, it considered whether the prosecutor's remarks caused "substantial prejudice to the accused." Doc. 74-4 at 28. The court concluded that none of the challenged statements did so. First, it held that the morgue photograph was not improper because it was not so gruesome as to prejudice the jury and because the prosecutor's comments, read in context, were not a threat to the jury. *Id*. at 30. Second, the court held that the prosecutor's statements about Gill's lack of alibi witnesses were

not improper because Gill had put the alibi at issue by testifying that he was with Harris during the shooting, an alibi that his counsel reiterated at closing argument. *Id*. at 31. Third, the court held that the prosecutor's statements regarding inconsistencies in witness testimony were not improper because the prosecutor was rebutting Gill's closing argument, which mentioned the inconsistencies, and because the prosecutor made clear that the State must prove Gill's guilt beyond a reasonable doubt. *Id*. at 33. Fourth, the court held that the prosecutor's statement that all eyewitnesses saw Gill with a gun, while incorrect, was not prejudicial because the prosecutor promptly corrected herself and did not rely on the misstatement, because defense counsel recounted the testimony accurately, and because the trial court instructed the jury to disregard comments in closing argument that were not supported by record evidence. *Id*. at 34.

None of the state appellate court's conclusions were contrary to or an unreasonable application of *Darden*. For each of the prosecutors' statements, the court explained why, in context, the statements were not improper. Moreover, none of the statements, even if improper, were prejudicial to Gill. Especially given the three eyewitness accounts against him, the prosecutor's statements cannot be said to have so infected the trial with unfairness as to amount to a violation of due process.

###### E.    Claim 8

Claim 8 alleges that Gill's appellate counsel on direct appeal was ineffective for failing to argue that the trial court erred in denying his motions to quash his arrest and suppress his inculpatory statements to the police. Doc. 49 at 53-58. Specifically, Gill contends that he was arrested without probable cause when he was placed in a locked interview room at the police station. *Id*. at 54. Gill further contends that his appellate counsel should have argued that his statements should have been suppressed because he was not provided a probable cause hearing

withing forty-eight hours of his arrest, as required by *Gerstein v. Pugh*, 420 U.S. 103 (1975). Doc. 49 at 53-58.

In rejecting that claim on postconviction review, the state appellate court correctly identified the *Strickland* standard. Doc. 74-11 at 11-13. To prevail under *Strickland*, Gill was required to show that appellate counsel's performance fell below an objective standard of reasonableness and that there was a reasonable probability that the appeal's outcome would have been different but for counsel's failings. *See Strickland*, 466 U.S. at 688-89. Appellate counsel is deficient under *Strickland* when counsel fails to raise a "significant and obvious issue" on appeal "without legitimate strategic purpose." *Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir. 1996). Appellate counsel's deficient performance is prejudicial "only [when] there is a reasonable probability that raising the issue would have made a difference in the outcome of the appeal." *Howard*, 225 F.3d at 791.

Gill's *Strickland* claim turns on the merits of his underlying contention that he was unlawfully arrested under the Fourth Amendment. Doc. 49 at 54. To obtain habeas relief, Gill must show that the state court decision was contrary to, or an unreasonable application of, both *Strickland* and the Supreme Court's Fourth Amendment precedents. *See Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015) ("Although this claim is framed in terms of whether Carter's lawyer was ineffective rather than the Confrontation Clause itself, the [Confrontation Clause] issue is nonetheless integral to the *Strickland* analysis here."); *Campbell v. Smith*, 770 F.3d 540, 547 (7th Cir. 2014) (explaining that a state court's application of a Supreme Court decision applying the Fourteenth Amendment was "embedded in the *Strickland* analysis"). A warrantless arrest is lawful under the Fourth Amendment only if supported by probable cause. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). "[A] person has been 'seized' within the

meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

The night after the shooting, Gill voluntarily went to the police station with Gasi and others. Doc. 74-11 at 3. Rossi first questioned Holness, who explained that Gasi had been out on the night of the shooting and returned home sometime after 11 p.m. with "Legend." *Id*. at 5. Holness told Rossi that Gasi and "Legend" had been evasive about what they had been doing. *Ibid*. Because Rossi knew that "Legend" was Gill's nickname, he then asked if Gill would agree to an interview. *Ibid*. Gill agreed, and Rossi put him in a locked interview room and kept him waiting for several hours. *Id*. at 5, 14. When Rossi returned, he read Gill his *Miranda* rights, and Gill told Rossi that he had been with Gasi the prior evening but denied any knowledge of the shooting. *Id*. at 5. The police then asked Gill to stay overnight to be in a lineup the next morning. *Id*. at 17.

The state appellate court explained that a person is "arrested" under the Fourth Amendment when "a reasonable person in the defendant's shoes would have believed himself arrested." *Id*. at 14. Applying this test, the court determined that Gill was not arrested when he voluntarily went to the police station, agreed to be questioned, and was placed in the interview room. *Id*. at 17. The court further held that probable cause to arrest Gill had developed over the course of the evening: Holness told Rossi that Gasi and Gill were together the night of the shooting and were acting evasively, the police had learned that "Junior" and "Dred" were involved in the shooting, and Gill himself admitted to being with Gasi the night of the shooting. *Ibid*. Those facts, the court held, provided probable cause to keep Gill overnight at the station. *Ibid*. The court explained that an appellate challenge to the trial court's denial of the motions to

suppress and quash would have failed, and it therefore held that Gill was not prejudiced by his appellate counsel's decision. *Id*. at 18.

The appellate court's decision was not objectively unreasonable. Gill was not arrested or otherwise seized within the meaning of the Fourth Amendment when he voluntarily arrived at the police station and agreed to be questioned. Even if Gill had been locked in the interview room, there is no indication that he could not have asked to leave at any time or when Rossi returned to question him. It was therefore not objectively unreasonable for the court to conclude that Gill was not under arrest when he made inculpatory statements during the interview. It follows that it was not objectively reasonable for the court to conclude that Gill was not prejudiced by his appellate counsel's failure to challenge the trial court's denial of his motions to suppress and quash. *See Wilson v. Boughton*, 41 F.4th 803, 811 (7th Cir. 2022) (holding a state court's application of *Strickland* not objectively unreasonable reasonable because the state court's determination that the underlying Confrontation Clause claim lacked merit was not objectively reasonable).

As to appellate counsel's failure to challenge the delayed probable cause hearing, a violation of *Gerstein* would not have entitled Gill to the suppression of his inculpatory statements. *Gerstein* establishes the right to a prompt judicial determination of probable cause as a prerequisite to prolonged detention. *See Gerstein*, 420 U.S. at 126 ("[T]he Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention."). The Supreme Court has never held, however, that statements obtained during any such prolonged detention must be suppressed. *See Edmonson v. Harrington*, 2013 WL 2178320, at *8 (N.D. Ill. May 20, 2013) ("[T]he United States Supreme Court has never held that a defendant is entitled to the suppression of statements made after an alleged []*Gerstein* violation."). Under Illinois law,

whether suppression is an appropriate remedy turns not on whether *Gerstein* was violated, but on whether the statements made during a *Gerstein* violation were voluntary. *See People v. Willis*, 831 N.E.2d 531, 542 (Ill. 2005) ("When faced with a *Gerstein*/*McLaughlin* violation, we ask simply whether the confession was voluntary—whether the inherently coercive atmosphere of the police station was the impetus for the confession or whether it was the product of free will."). Gill has not argued that his statements were involuntary, so he cannot show that his appellate counsel was ineffective in failing to raise the argument under *Gerstein*.

Consequently, neither of Gill's arguments as to his appellate counsel's ineffectiveness support federal habeas relief.

F.    **Claim 9**

Claim 9 alleges that the State's presentation of an accountability theory at trial broadened the indictment without providing Gill adequate notice, thereby violating due process. Doc. 49 at 59-61. Specifically, the indictment did not specify that the State would seek to prove Gill's guilt on an accountability theory of culpability. *Id*. at 59. The state appellate court rejected this claim, holding that due process does not require a criminal indictment to specify whether a prosecutor will seek to prove the defendant's guilt as a principal or as an accessory. Doc 74-11 at 18. Gill does not identify, nor has this court found, any decision from the Supreme Court indicating that the state court's decision was contrary to or an unreasonable application of federal constitutional law. *See United States v. Schuh*, 289 F.3d 968, 976 (7th Cir. 2002) ("[A]iding and abetting is merely a theory of liability, not a substantive offense, and need not be charged in the indictment."). The appellate court further concluded that the jury convicted Gill as a principal because it found that he had fired the shot that killed Moore. Doc. 74-11 at 18 n.2. Thus, even if Gill's due process rights were violated by an indictment that failed to put him on notice of an

accountability theory, the violation was harmless because Gill was found guilty as a principal. Claim 9 therefore fails.

## V.     Requests for an Evidentiary Hearing and Appointment of Counsel

Gill asks this court to conduct an evidentiary hearing.  Doc. 49 at 52, 58, 61, 81; Doc. 75 at 29.  The Supreme Court has held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster,* 563 U.S. 170 (2011).  Because all of Gill's claims either were presented to and adjudicated on the merits by state courts or are procedurally defaulted or moot, § 2254(d)(1) applies to this court's analysis of those claims, and *Pinholster* forecloses this court from going beyond the state court record by holding a hearing to collect new evidence.  *See Mosley v. Atchison*, 689 F.3d 838, 844 & n.1 (7th Cir. 2012); *Price v. Thurmer*, 637 F.3d 831, 837 (7th Cir. 2011).  Gill's request for an evidentiary hearing therefore is denied.

Gill also asks the court to appoint a lawyer to help him investigate his ineffective assistance of trial and appellate counsel claims and his due process challenge to the State's accountability theory.  Doc. 49 at 52, 58, 61, 81.  Given that there will be no hearing and that Gill's ineffective assistance and accountability claims fail as a matter of law, Gill's request for appointment of counsel is denied as well.  *See* Rule 8(c) of the Rules Governing Section 2254 Cases ("If an evidentiary hearing is warranted, the judge must appoint an attorney to represent a moving party who qualifies to have counsel appointed under 18 U.S.C. § 3006A."); 18 U.S.C. § 3006A ("Whenever … the court determines that the interests of justice so require, representation may be provided for any financially eligible person who … is seeking relief under section 2241, 2254, or 2255 of title 28.").

## Conclusion

Because Gill's claims are procedurally defaulted, moot, or substantively meritless, his habeas petition is denied. Gill's requests for an evidentiary hearing and the appointment of counsel are denied as well. Rule 11(a) of the Rules Governing Section 2254 Cases states that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." *See Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011). The applicable standard is as follows:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that … includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.

*Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (internal quotation marks omitted).

This court's denial of Gill's habeas petition relies on settled precedents and the application of those precedents to his petition does not present difficult or close questions, and so the petition does not meet the standard for granting a certificate of appealability. This court therefore denies a certificate of appealability.

August 30, 2022

_____
United States District Judge